MIDDLESEX BANKING COMPANY ET AL. *v.* SARAH M. FIELD.

1. DEEDS. *Construction. Estates tail. Limitations over to heirs of donor.* Code 1880, § 1190. Code 1892, § 2436.

Under Code 1880, § 1190 (Code 1892, § 2436), prohibiting estates tail, but providing that a conveyance or devise may be made to a succession of living donees, not exceeding two, and the heirs of the remainderman, and in default thereof to the right heirs of the donor in fee simple:

(*a*) A grantor who reserves out of the operation of his deed a life estate for himself cannot be counted as one of the donees within whose life the ultimate fee must vest in order to preserve the deed under the rule against perpetuities.

(*b*) A conveyance to two designated persons, with cross-remainders in favor of the survivor in case of the death of either without issue, and a conditional limitation over to a third person, the right heir of the donor, in case of the death of the two first takers, without issue, is valid.

(*c*) A limitation over to a designated person, being one of the right heirs of the donor, conditioned on the death of two specified donees without issue, is valid.

(*d*) The right heirs of the donor take by purchase, and not by descent.

(*e*) The section by its express terms is applicable to conveyances as well as devises.

(*f*) Its object is to prescribe a limit of time beyond which the vesting of the estate in fee cannot be suspended, but within that limit it permits the exercise of unbounded discretion by the donor.

2. SAME. Code 1880, § 1203. Code 1892, § 2448.

Under Code 1880, § 1203 (Code 1892, § 2448), changing the common law and providing that a clause in a deed or a will vesting title in one person in case of the death of another, without issue of his body, shall be held as a limitation to take effect when the person named shall die without issue of his body living at the time of his death or born to him within ten months thereafter, unless the intention of the limitation be otherwise expressly and plainly declared on the face of the instrument creating it:

(*a*) The first taker has an estate in fee, determinable on the contingency of death without surviving issue, and the limitation over is conditioned on the death of the first taker without issue.

(*b*) A limitation over in case of the death of the first taker without issue is, in the absence of a plain declaration to the contrary, a limitation in case of his death without issue living at the time of his death or born in ten months thereafter, so that the first taker has a life estate, and the issue surviving, or born within ten months, will have a fee simple by way of an executory devise; but if the deed or will plainly declares a different construction, an estate tail will be created, which under the statute (Code 1880, § 1190; Code 1892, § 2436) is a fee simple in the first taker.

(*c*) A conditional limitation does not cut down the prior estate in fee, nor extend nor accelerate its termination, but takes effect only at its termination.

3. Same. *Concrete case.*

A deed conveyed certain property to A. to hold the same on the following trusts: (1) That the grantor should have the exclusive right to the possession and control of the property granted during his lifetime, and be entitled to the rents and profits arising therefrom; (2) that on the death of the grantor A. should have the possession and control of the property, and receive for his services one-third of the rents and profits, and use the remainder of the rents and profits for the maintenance and education of B. and C. It was then provided that on the death of A. the property should vest in B., one-half for herself and the other half in trust for C.; but in case of the death of B. or C. "without issue of the body" the whole property should vest in the survivor, subject to the rights of A., and in case both B. and C. should die without issue the whole property should vest absolutely in A. or his heirs at law. The court decided that the effect of the deed was to reserve to the grantor a legal life estate, with remainder over in fee to B. and C., their fees being determinable on the contingency of dying without surviving issue, in which case there were cross-limitations in favor of the survivor and a conditional limitation over to A. in case of the death without surviving issue of both B. and C.

4. Contracts. *Settlement of litigation. Compromise.*

An intelligent, competent litigant, fully informed and advised by able counsel, who, after time for reflection, makes a settlement of pending litigation, there being no concealment on the part of any

one, by which he receives money, is bound by the settlement and precluded from further prosecution of the suit.

FROM the chancery court of Bolivar county.

HON. A. McC. KIMBROUGH, Chancellor.

Bill by Eldon C. Field against the Middlesex Banking Company and others to procure the cancellation of certain instruments on the ground of fraud. Eldon C. Field died, and the suit was revived in the name of Bate Field as his sole devisee and legatee. Subsequently Bate Field died, and the suit was revived in the name of Mrs. Sarah M. Field as devisee and legatee. From the decree rendered, certain defendants appealed to the supreme court.

For a previous decision in the case, see *Field* v. *Middlesex Banking Co.,* 26 South., 365; s. c., 77 Miss., 180.

Eldon C. Field, a bachelor, owned four plantations in Bolivar county, Miss., and in November, 1889, he had a stroke of paralysis, which for a time affected him seriously both mentally and physically. His property was worth about $30,-000, and was incumbered. On January 7, 1890, he executed a power of attorney to his brother, J. H. Field, Sr., making him his general agent, with large powers. On August 30, 1890, he executed a deed to said J. H. Field, Sr., which is set out in full in the opinion of the court by WHITFIELD, C. J., conveying to him all of said plantations on certain trusts and limitations therein set out. Acting under this deed, J. H. Field, Sr., undertook to borrow money on these plantations, and was informed by the parties to whom he applied that they would not make loans to trustees, and it was then agreed that the places should be sold under the deeds of trust then on them and a judgment then in force against Eldon C. Field, and that Julien Field should purchase and take the title in his name; and the Middlesex Banking Company agreed to furnish the money with which to make these purchases, and to lend Julien Field additional money on them. Under this arrange-

ment the titles were all conveyed to Julien Field, and he borrowed the additional money agreed to be furnished, and gave deeds of trust on the plantations to secure it; and under these deeds of trust they were all subsequently sold, and purchased by the Union Investment Company, but before these sales, at the request of the attorney for the Middlesex Banking Company, E. C. Field and J. H. Field, Sr., executed a quitclaim deed to Julien Field. On April 20, 1894, Eldon C. Field filed his bill in the chancery court of Bolivar county against J. H. Field, Sr., Bate Field, J. H. Field, Jr., and Julien Field, the Middlesex Banking Company, the Graves & Vinton Company, their agent, and Lee J. Lockwood, manager of the Graves & Vinton Company, the trustee. The bill alleged that the power of attorney executed to J. H. Field, Sr., was void because he was mentally incapacitated to execute it, and that the deed of August 30, 1890, was void for the reason that J. H. Field, Sr., represented to him that it was a will; that the quitclaim deed to Julien Field was void because it was never known of or accepted by him; and that each and all of the deeds and deeds of trust by means of which the said property was incumbered and sold were void because brought about by a conspiracy between J. H. Field, Sr., with Julien Field and the other defendants to breach the trust of August 30, 1890. The bill sought the cancellation of all these instruments.

These defendants all answered this bill, denying the equities set out therein. Some testimony was taken, but E. C. Field died March 20, 1895, testate, leaving all his property to Miss Bate Field. In April, 1895, Miss Bate Field employed the same counsel who had represented E. C. Field and probated the will of E. C. Field, and had herself appointed administratrix with will annexed, and revived the suit begun by E. C. Field in the name of Bate Field, sole devisee and legatee of E. C. Field. Some further proof was then taken. On November 25, 1896, after considerable negotiations, a compromise

was effected of this suit, referred to by Justice TRULY in his concurring opinion, and Bate Field and J. H. Field, Jr., executed a special warranty deed to L. J. Lockwood, who afterwards conveyed the land to the Union Investment Company. In February, 1897, before the decree dismissing the cause had been entered, Miss Bate Field filed her supplemental bill, in which she sought to set aside and cancel the compromise and the special warranty deed and to continue the suit, and asked for the cancellation of the several deeds mentioned in the pleadings. The defendants all answered this bill, and the cause was heard, and a final decree rendered dismissing the bill. From that decree complainant appealed to the supreme court, and the cause was reversed, with instructions to allow the pleadings reformed. 26 South., 365; 77 Miss., 180. After the mandate was filed in the lower court, Miss Bate Field filed a cross-bill styled "Cross-bill of Bate Field, one of the defendants, against her co-defendants, J. H. Field, Sr., Julien Field, Lee J. Lockwood, the Graves & Vinton Co., the Middlesex Banking Co., and the Union Investment Co." In this bill she sets up the execution of the deed of August 30, 1890, the death of J. H. Field, Jr., without issue, and that by the will of E. C. Field all his property was devised to her. She alleges that neither under the power of attorney nor the deed of August 30, 1890, was authority given J. H. Field, Sr., to incumber any of the land; that J. H. Field, Sr., the Middlesex Banking Company, the Graves & Vinton Company, their agents, and Lee J. Lockwood, combined and confederated to breach the trust under which the lands had been conveyed to J. H. Fields, Sr., on August 30, 1890; to disincumber said lands of said trust, and to get the title so that the lands would be under the unrestrained control of J. H. Field, Sr.; that for that purpose they entered into a scheme under which the title should be vested in Julien Field, who was to hold it subject to the will and control of J. H. Field, Sr. The bill then sets out the various

deeds, deeds of trust, etc., and charges that they were parts and parcels of the original illegal and fraudulent scheme. The bill then charges that the legal title is in Julien Field, a mere volunteer, holding it as the agent of J. H. Field, the delinquent trustee, for complainant and her brother and E. C. Field; that the fraudulent purpose was known to and participated in by all the defendants; and that the property is in equity chargeable with the same trusts under which it was held by J. H. Field, Sr. The bill avers: That under the deed of August 30, 1890, and by reason of the death of J. H. Field, Jr., there was vested in her a complete equitable estate in fee simple of all said lands, the limitations sought to be created in J. H. Field, Sr., being void for remoteness, and against the rule forbidding perpetuities in this state; and that, whether her title be considered as derived under this deed or under the will of E. C. Field, she is seized of a complete equitable estate in said lands and is entitled to a transfer of the legal title; that on the 21st day of November, 1896—the day after she obtained her majority—and without competent and sufficient advice, and without the knowledge of the various fraudulent acts of the defendants, she and her brother executed a quitclaim deed in consideration of $1,000 paid to each of them, whereby they conveyed to L. J. Lockwood their interests in said lands. The bill here charges that defendants willfully and knowingly concealed from them all knowledge of the various fraudulent schemes and actions charged; that she was not advised of any interest she had under the deed of August 30, 1890, and that she only intended to convey such estate as she acquired under the will of E. C. Field. She tenders the money received for the quitclaim deed. The defendants answered, denying specifically the equities of the cross-bill.

Miss Bate Field died testate, leaving all her property to her mother, Mrs. Sarah M. Field, and the suit was revived in her name. A large amount of testimony was taken, and on the

final hearing there was a decree sustaining the cross-bill and granting the relief sought therein. From that decree the Middlesex Banking Company, Lee J. Lockwood, the Graves & Vinton Company, and the Union Investment Company appeal.

*Green & Green,* and *Calvin Perkins,* for appellants.

*Carroll, McKellar & Bullington,* and *Tim E. Cooper,* for appellees.

[The briefs of counsel in this case were unusually full and able, but in view of the great length of the case a synopsis is not made of any one of them.]

Argued orally by *M. Green* and *Calvin Perkins,* for appellants, and by *Tim E. Cooper* and *William H. Carroll,* for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

The chief question for solution is, Is the limitation over of the ultimate fee to J. Harris Field, Sr., by the deed of August 30, 1890, valid? That deed is as follows:

"This deed of conveyance, made and executed at Florence, Ala., on this 30th day of August, 1890, by and between Eldon C. Field, hereinafter designated as the first party, and J. Harris Field, Bate Field, and J. Harris Field, Jr., hereinafter designated as the second parties, witnesseth: That the first party, for and in consideration of the natural love and affection which he has for the second parties (his brother, niece, and nephew), does hereby bargain, sell, and convey to the said J. Harris Field, in trust for the said Bate Field and J. Harris, Jr., the following lands: [Here follows a description of the four plantations in controversy.] To have and to hold the said lands, with all and singular the appurtenances thereunto belonging, unto the said J. Harris Field as trustee as aforesaid, upon the trusts and conditions as herein provided—that is to say:

"1. That the first party shall have and retain during his natural life the exclusive right to the possession of all of the said lands, and shall have the entire management and control of the same, and shall be entitled to all the rents, income, and profits arising therefrom as fully as if he were the absolute owner of the lands.

"2. That on the death of the first party, the said J. Harris Field, as trustee aforesaid, shall take possession of all of said lands, and shall manage and control the same during his natural life, and shall receive for his services as such trustee one-third of the rents, incomes, and profits of said lands. During the minority of the said Bate Field and the said J. Harris Field, Jr., the said trustee shall use the remaining two-thirds of the rents, incomes, and profits of the lands for their maintenance, support, and education, or he may hold, use, or invest the same as he may deem fit for their interest, and he shall not be liable for any loss that may occur in the management and control of said trust property or of the rents, incomes, and profits thereof, it being the intention of this deed to give said trustee large powers and discretion. The said trustee, J. Harris Field, after the death of the first party, may, if he deems it advisable, sell or exchange said lands or any part thereof, and, in case of sale, shall reinvest the proceeds in other property, which, together with any property received in exchange for said lands or any part thereof, shall be held subject to all trusts and conditions and terms of this deed as fully as if incorporated herein, and he shall have like authority and powers as to the property received in exchange and the property in which the reinvestment is made; and it is hereby expressly provided that purchasers from said trustee shall not be chargeable with seeing to the application of the purchase price received by said trustee for any property sold or exchanged, it being the intention hereof to give said trustee as full power and authority in making sales and conveyances as if he were the owner of the property.

"3. On the death of said J. Harris Field all the property herein conveyed and all property hereafter acquired hereunder shall vest in the said Bate Field; one-half for herself, and the other half she shall hold in trust for the said J. Harris Field, Jr. She shall pay to the said J. Harris Field, Jr., annually one-half the net income, rents, and profits of such trust property, and she shall not be liable for failure to make said property productive nor for any loss that may occur in the management and control of the trust property or of the rents, incomes, and profits thereof. She has full power to make all needed and convenient improvements and repairs on said property and to apply the income and profits to the payment thereof, and she shall be the judge of what improvements and repairs are needed and convenient.

"4. Should the said Bate Field or J. Harris Field, Jr., die without issue of the body, the whole property herein conveyed shall vest in the survivor, subject to the rights of the said J. Harris Field hereinbefore mentioned; and in case both shall die without issue of their bodies, the whole property shall vest absolutely in the said J. Harris Field or his heirs at law if he be then dead.

"Given under my hand and seal this day and year above written.

"ELDON C. FIELD.

"Attest: CHAS. O. ROLFE."

(Acknowledged August 30, 1890, and filed for record September 3, 1890.)

The statutes which bear upon this question are as follows:

Rev. Code 1880, § 1189: "Every estate in lands, granted, conveyed, or devised, although the words deemed necessary by the common law to transfer an estate of inheritance be not added, shall be deemed a fee simple, if a less estate be not limited by express words, or unless it shall clearly appear, from the conveyance or will, that a less estate was intended to be passed thereby."

Rev. Code 1880, § 1190: "Estates in fee tail are prohibited; and every estate which shall create an estate in fee tail shall be an estate in fee simple; provided, that any person may make a conveyance or a devise of lands to a succession of donees then living, not exceeding two; and to the heirs of the body of the remainderman, and, in default thereof, to the right heirs of the donor, in fee simple."

Rev. Code 1880, § 1201: "A conveyance or devise of land or other property to any person for life, with remainder to his heirs or heirs of his body, shall be held to create an estate for life in such person, with remainder to his heirs or heirs of his body, who shall take as purchasers, by virtue of the remainder, so limited to them."

Rev. Code 1880, § 1203: "Every contingent limitation, in any conveyance or will, made to depend upon the dying of any person, without heirs, or heirs of the body, or without issue, or issue of the body, or without children, or offspring, or descendant, or other relative, shall be held and interpreted as a limitation to take effect when such person shall die not having such heir, or issue, or child, or offspring, or descendant, or other relative (as the case may be) living at the time of his death, or born to him within ten months thereafter, unless the intention of such limitation be otherwise expressly and plainly declared on the face of the instrument creating it."

Rev. Code 1880, § 1197: "All conveyances or devises of lands made to two or more persons, or to a husband and wife, shall be construed to create estates in common, and not in joint tenancy or entirety, unless it shall manifestly appear, from the tenor of the instrument, that it was intended to create an estate in joint tenancy, with the right to the survivor or survivors; provided, this provision shall not apply to mortgages or devises or conveyances made in trust."

It is clear that Eldon C. Field excepted from and reserved out of the operation of this deed a legal life estate for himself,

from which it follows that he cannot be counted as one of the donees within whose life the ultimate fee must vest. It is earnestly insisted by counsel for appellee that no legal life estate was left in Eldon C. Field after the execution of this deed; but that J. Harris Field, Sr., held the whole legal title, and held it as much for Eldon Field as for Bate and Harry—in other words, that Eldon C. Field limited an equitable estate for life to himself by this deed. Counsel counts on this language—to wit, "To have and to hold the said lands, with all and singular the appurtenances thereunto belonging, unto the said J. Harris Field, Sr., as trustee as aforesaid, upon the trusts and conditions as herein provided," etc.; but the language of the first clause clearly shows that what Eldon C. Field did was to reserve a legal life estate. He "retains" during his own life the "exclusive right to the possession of said property;" and he is to have the "entire management and control of the same as fully as if he were the absolute owner of the lands." J. Harris Field, Sr., is not to enter upon the possession of the property until the death of Eldon C. Field. The plain meaning, manifestly, is that Eldon C. Field reserves a legal life estate. We think the scheme of the deed was this: (1) To reserve to Eldon C. Field a legal life estate; (2) to convey the property after his death to Bate and Harry Field, with cross-limitations between them if either should die without issue living at his or her death; (3) to convey the ultimate fee in the property, if both Bate and Harry should die without issue living at the time of their respective deaths, to J. Harris Field, Sr. Bate and Harry took fees determinable upon the contingency of dying without issue living at his or her death, with a conditional limitation over to J. Harris Field, Sr. *Busby* v. *Rhodes,* 58 Miss., 237; *Halsey* v. *Gee,* 79 Miss., 193 (30 South., 604); *Brattle Square Church* v. *Grant,* 3 Gray, 142 (63 Am. Dec., 725)—a masterly exposition of the law as to conditional limitations.

At the common law, under sec. 4 of the deed, "in case both shall die without issue of their bodies, the whole property shall vest absolutely in the said J. Harris Field," etc., the words "without issue of their bodies" would have imported an indefinite failure of issue, and they would have taken at common law only a fee tail by the conveyance; and the effect of § 1203, Rev. Code 1880, providing that the words "without issue of the body" in clauses like this shall be held and interpreted as a limitation to take effect when such person shall die without issue of the body living at the time of his death, etc., is to prevent the estate conveyed to Bate and Harry from becoming a fee tail. The limitation to J. Harris Field, Sr., is a conditional limitation over after the death of Bate and Harry, both, leaving no issue at their respective deaths. Such a conditional limitation does not cut down the estate in fee. It takes effect only at the termination of the prior estate, and neither extends the prior estate nor accelerates its termination. *Brattle Square Church* v. *Grant, supra.* Bate and Harry took estates in fee, determinable upon the contingency of their dying without issue at the time of their deaths, respectively.

It will not be out of place just here to look a little into the history and reason of this § 1203, Rev. Code 1880. The old construction defeated the intention in this way: Take a case: A. devises Blackacre to B. and the heirs of his body, and, if B. dies without issue (etc.), over to C. and his heirs. The intention of the devisor is to create an estate tail, and he meant the property to go to the heirs of B.'s body as long as there were any. The construction put on the words "die without issue" by the courts was in the line of this intention—to wit, that they meant not only issue of B. living at B.'s death, but any issue of B.—grandsons, great-grandsons, etc.—as long as any descendants of B. were living; and hence that there were two contingencies, on the happening of either of which the limitation to C. should take effect—to wit, failure of B.'s issue

at B.'s death, and, second, failure of B.'s issue at any time in the future. The contingency was uncertain and indefinite—*i. e.,* the failure of issue was so—as no man could tell WHEN the issue would fail, and it might NEVER fail; and hence that the limitation to C. was not to take effect until B.'s descendants ultimately at an indefinite time failed. So far the intention of the testator was being carried out; but the courts, thus construing the words, of course gave B. an estate tail, and this he could bar, and acquire a fee simple, and sell the lands, and his heirs would not take what the devisor meant; and this resulted in a defeat of the devisor's intention. It is plain that it was not the *construction* of the words "die without issue" *alone,* that defeated the intention of the devisor, but the *right* given by law to *bar the estate tail resulting from* such construction. The two together operated the defeat of the devisor's intention, who meant an estate tail, and was ignorant of the law allowing it to be barred by his devisee.

Again, in the case stated, if B. died, leaving his wife *enceinte* of a son, he was esteemed at common law to die without issue living at the time of his death; or, if he had had one son, who married, and died, leaving *his* wife *enceinte* of a son, and then B. died before the birth of the grandson, he was esteemed to die without issue living at the time of his death (the ten months, afterwards put in by statute, not being by common law allowed); but in both cases B. had issue, though not living at the time of his death—in one case a son, in the other a grandson, who might have indefinite issue; and the issue was thus indefinite upon whose failure it was held the limitation over to C. was to take effect, and hence an estate tail was the result, as above stated.

Now, the only effect of the ten months added by the statute is to characterize the son or grandson *en ventre sa mere* as living at the death of B., and to put such son or grandson in

the same position he would have been in if he had been actually born, and not *en ventre sa mere,* at B.'s death.

Before this statute, if the courts had held that C. was to take if there was no issue of B. living at B.'s death, C. would have taken in exclusion of the son or grandson supposed above *en ventre sa mere.* Since that statute it is not possible that C. could. take (if estates tail were allowed) while there is any descendant of B. *en ventre sa mere* at the time of B.'s death (for all children are born within ten months). Now, if B. has issue living at his death, or born within ten months thereafter, such issue takes a fee simple, and the limitation over is void. If B. dies without issue living at the time of his death, or born within ten months thereafter, C. takes, unless A. plainly says in his will he does not mean C. to take while B. has any descendants living; and in this case (and in this case as in an estate tail that is created by the will) the statute converts it into a fee simple in B. himself, who may sell it, and cut out his heirs, the objects of the devisor's bounty. The difference is this: If the devisor does not plainly declare in the will that he never means C. to take while B. has any descendants living, the words "die without issue" mean "die without issue living at his (B.'s) death, or born in ten months thereafter," and the result is a life estate to B. and a fee simple, by way of executory devise, to B.'s issue living at his death, or born in ten months thereafter. The grandchildren ·(or other descendants) are protected, and the devisor's intention effectuated as far as it can be. If B. has no such issue when he dies, C. takes, and this carries out also the devisor's intention. But if A. does so plainly declare, then he attempts to create an estate tail, which (as the result of his ignorance of the law) is a fee simple in B., and his intention is defeated.

Statutes. changing this old construction are of two kinds— those, like that of New York, which imperatively say in the case supposed that the words mean "die without issue living at

the time of his death, or born in ten months thereafter;" and, second, those, like ours, which merely change the presumption, and shift the burden of proving that A. meant an indefinite failure of issue upon A. by making him so declare in his will. The old construction never obtained in Ohio (American L. C. R. P., p. 490), and in Georgia it is held that it was an erroneous construction of the statute *de donis* by the English courts, in harmony with their peculiar rules of property, primogeniture, estates tail, etc. English courts construe according to their customs; American courts should favor executory devises to carry out the intent. "Heirs" or "issue" may be so used as to mean "children," in which cases the statute does not apply, is unnecessary, and a definite failure is intended; and so where devise over is on the death of B. without issue, before a certain person dies, etc., or where it is if B. dies unmarried and without issue, the limitation is defeated even if B. marries and has issue; or where the devise is that on the death of the first taker, B., without issue, the executors of devisor shall sell, etc., the failure meant is indefinite, and the limitation fails. See Williams on Real Property, p. 214; and Leading Cases on American Law of Real Property, Sharswood & Budd, vol. 2, p. 489, *et seq.*

Returning from this discussion of the history and reason of § 1202, Rev. Code 1880, we find ourselves advanced thus far in the construction of this deed: (1) It is clear that Eldon C. Field is not to be counted as one of the donees within whose life the ultimate fee must vest. (2) That under sec. 4 of the deed Bate and Harry took fees determinable upon the contingency of their dying without issue living at the time of their respective deaths. (3) In case they should so die, the ultimate fee was limited over to J. Harris Field, Sr.

The remaining question to consider in determining the validity of the limitation over to J. Harris Field, Sr., is whether, under § 1190, Rev. Code 1880, this limitation over of the ulti-

mate fee to J. Harris Field, Sr., specifically, is one that may
be validly made, in lieu of one to the right heirs of the donor,
generally, without specification.    J. Harris Field, Sr., was
the right heir of the donor.    Bate and Harry both died without
issue living at the time of their respective deaths.    There were,
therefore, no heirs of the body of the remainderman.    Bate and
Harry would both have an estate of an undivided half interest
in a determinable fee upon the death of Eldon C. Field, with
cross-remainders between them, in favor of the survivor of
them; and in case of the death of both without issue there was
a limitation over of the ultimate fee to J. Harris Field, Sr.
Bate Field and, *mutatis mutandis,* J. Harris Field, Jr., would
each be donee of that half interest.    Then upon the death of
either without issue living at the time of the death, the survivor
would take the half interest of the one so dying.    This survivor
would be, as to his or her original half interest, a *second* donee,
and there would then remain the limitation over to J. Harris
Field, Sr., who was the heir at law of the grantor.    As to the
original half interest held by the survivor, J. Harris Field, Sr.,
would be the *second* donee; and as to the half interest accrued
to the survivor, J. Harris Field, Sr., would claim as being—
expressly within the language of the statute—the heir at law of
the donor, there being a default of heirs of the remainderman.

It is very ingeniously and ably argued for appellant, in op-
position to the validity of this limitation over to J. Harris
Field, Sr.: (1) That under § 1190, Rev. Code 1880, the limita-
tion to the right heirs of the donor must be to them generally,
and not specifically to one of them; and that no such limita-
tion over any third person can be made in lieu of a limita-
tion to heirs of the body of the remainderman.    (2) That the
words "any person may make a conveyance or a devise of lands
to a succession of donees then living, not exceeding two, and
to the heirs of the body of the remainderman, and, in default
thereof, to the right heirs of the donor," mean that the words

"and to the heirs of the body of the remainderman" were applicable *alone* to a *devise,* and not to a *deed.* (3) That the words "to the right heirs of the donor in fee simple" mean that the estate is to go to the heirs of the donor by *descent,* and not by *purchase,* by operation of the terms of the deed. (4) That sec. 1190 does more than the rule against perpetuities did—to wit, that it declares not *only* when the ultimate fee must vest, but the *number* of those to whom precedent estates may be limited; and since, as contended, a valid limitation of the ultimate fee could not be made to J. Harris Field, Sr., in lieu of the heirs of the remainderman, J. Harris Field, Sr., is to be treated as a *third limitee* in *number,* and hence that the limitation is to be declared void as too remote.

In answer to the first proposition, it is to be said that in *Busby* v. *Rhodes,* 58 Miss., 240, and *Cannon* v. *Barry,* 59 Miss., 299, and *Halsey* v. *Gee,* 79 Miss., 193 (30 South., 604), this court has expressly held that a limitation over to a *specific* person, *being one of the right heirs of the donor,* is valid; and in this same connection it is enough to say in regard to the fourth proposition above that this court has held in *Jordan* v. *Roach,* 32 Miss., 620, and *Cannon* v. *Barry,* 59 Miss., 299, that the object of this statute is to specify a *time limit* beyond which the grantor cannot go, but *within* which he can exercise unbounded discretion; that the purpose of the statute was to prescribe a *limit of time* beyond which the vesting of the estate in fee could not be suspended; that the lives of the two donees in being were the measure of time within which the ultimate fee must vest—in other words, that the statute prescribed a *limit of time,* and not a *formula of conveyancing.* In answer to the second proposition above stated, we have only to point to the express language of the statute, § 1190, Rev. Code 1880: "Any person may make a *conveyance* or a *devise,*" etc., "to a succession of donees," etc., "and to the heirs," etc., "and in default thereof to the right heirs of the donor." And as to the third

proposition above set out, the conclusive reply is that in *Busby* v. *Rhodes* and *Halsey* v. *Gee* and *Cannon* v. *Barry, supra,* this court has expressly held that the right heirs of the donor took by *purchase,* and not by *descent;* as *limitees* under the terms of the deed or will, and *not* as *heirs.* It is further to be remarked that many legislatures have met between *Jordan* v. *Roach* and *Halsey* v. *Gee,* and several codes of law have been adopted in that time; and yet this statute, with these terms in it, has remained through all these years, with the above construction put upon it, unchanged. If anything can have become, in the most solemn form, a rule of property, the construction put upon this statute is certainly such a rule; and it is far too late now to seek to overturn that rule. It is specially to be noted further that, if it had been the legislative purpose that the right heirs of the donor were to take by *descent* as *heirs,* apt words to express that purpose could easily have been used—as, for example, "to revert to the heirs of the donor;" whereas, on the contrary, this statute repeats and repeats the word "to," as pointed out above: "to donees," "to heirs of the body," "to the right heirs of the donor." It expressly declares that conveyances or devises can be made to these various categories of persons. It confers a *power* in derogation of the first clause of the section, and expressly designates the person to whom such deeds or devises can be made. It would be utterly incongruous to use the words, "conveyance to," in speaking of title cast by descent. Let it be noted again that the changed language of the act of 1822 (Hutch. Code, p. 609, sec. 24), by the code of 1857, ch. 36, art. 3, whereby the words, "to the heirs of the body of the remainderman," were substituted for the words, *"the heir or* heirs of the body of the remainderman," demonstrates that "heirs of the body," in this clause, were referred to as *purchasers;* and this was expressly so held in *Jordan* v. *Roach,* where the court say: "Whatever interest the donor or devisor may choose to give to the remainderman, where the

estate is conveyed to a succession of donees, with a limitation over to the heirs of his body, it is certain it cannot be an estate of inheritance, as the heirs of the body of the remainderman must take, if they take at all, as purchasers, and not as heirs." No just distinction can be drawn between the language of the statute in the clause between the words, "to heirs of the body," and "to the right heirs of the donor." They are alternatives of each other. If there be no heirs of the body of the remainderman, the right heirs of the donor are held to take as purchasers.

We are, therefore, of the opinion that the limitation over of the ultimate fee to J. Harris Field, Sr., one of the right heirs of the donor, is by the express terms of the statute, and in accordance with the uniform decisions of this court, a valid limitation. It may be confessed that, as insisted by counsel for appellee, the original of this statute (sec. 1190) is obscurely drawn, and that the "original draftsman of the statute had no conception of his own meaning, or of the common-law rules he was displacing;" and the incongruity of dealing, in the same section, with the subjects of fee tail and the rule against perpetuities, is obvious. From this fact follows, doubtless, the difficulty of harmonizing in all respects the decisions of this court in the construction of this statute. The court did not make the statute. It had to deal with it as best it could, being made; just as the court, in *Jordan* v. *Roach, supra,* had to treat the act of the 13th of June, 1822, concerning conveyances, as being one expressly intended to abolish estates tail, which the legislature supposed were sanctioned by the law at that time, although the whole doctrine in regard to estates tail and executory devises (which were ingrafted by the English courts upon the statutes of Westminster II, 13 Edward I, called the "Statute de Donis Conditionalibus," and the Statute of Wills, 32 Henry VIII) never had any existence in this state by any express or positive legislative enactment. All the statutes of England not reënacted in

Mississippi were, in the year 1807, excluded from operation within the territory of Mississippi. Hutch. Dig., 65. And neither of the two statutes referred to was in force in Mississippi when the act of 1822 was passed, and yet the legislature passed that act supposing they were in force. This court has had to deal with the act of 1822, and with the original of this sec. 1190, as best it could, conceding the obscurity and confusion resulting from the ignorance of the draftsmen. It may further be conceded that it would have been wiser if this court had originally construed this statute, as intended, as a substitute for all common-law rules to which its provisions can apply, instead of as merely amendatory of the common law; but for us it must be enough that the long line of contrary decisions has become now crystallized into a rule of property. It may also be conceded as a sound original proposition that, since the term of twenty-one years and the ordinary period of gestation —ten months—were added to the term of any number of lives in being, first, as a time added in the event of the minority of the last taker, because, during such minority, he could not alien the estate, and because, second, this extended the period of the rule, and was afterwards added to it as a fixed time without regard to minority, therefore, our statute (said sec. 1190) cannot have the period of twenty-one years and ten months added to it, since it fixes by its own terms the time limit within which the ultimate fee must vest. Certainly it seems true that at the time of the passage of our act of 1822, *supra,* dealing with this subject, the addition of the period of twenty-one years and ten months as a gross term, regardless of minority, was not allowed in the courts of England themselves. In *Loyd* v. *Carew,* Show, P. C. 107, decided in 1698, it was held that a period of one year might be added to lives in being, because no inconvenience could result therefrom. In *Beard* v. *Weatcott,* 5 Taunton, 393, thrice argued, it was held that the gross term of 21 years could not be added. This was decided in 1810.

Gray on Perp., sec. 184. And it was not until the decision in *Cadell* v. *Palmer,* 1 Cl. & F., 411, in 1832, that the rule as now established was finally settled in England—a period of ten years after the adoption of our act of 1822. But whilst that might have been the better holding originally, the direct contrary has been held in *Cannon* v. *Barry,* 59 Miss., 289, and *Caldwell* v. *Willis,* 57 Miss., 555, and, therefore, this principle has become a rule of property not to be overturned.

It will be observed that I have confined this opinion to a ground not touched in the former opinion of this court. *Field* v. *Banking Co.,* 77 Miss., 180 (26 South., 365).

We cannot conclude this opinion without acknowledging our indebtedness to the briefs of counsel on both sides, which are marvels of profound learning, searching analysis, and clear reasoning.

*It follows from these views that the decree in the court below must be, and is hereby, reversed, and the bill dismissed.*

CALHOON, J. (concurring).

The deed puts the legal title in J. Harris Field, Sr., to take effect on the death of Eldon C. Field, the grantor, as trustee of an active trust for Bate Field and J. H. Field, Jr., to last during the life of the trustee, who is to have one-third of the usufruct as compensation; and if he should die in the lifetime of Bate Field, the title goes to her for herself and J. H. Field, Jr., they to share the usufruct; and on the death of either without issue of the body the other is to have the whole estate, subject to the rights of J. H. Field, Sr.; and on the death without issue of the survivor of the two, Bate and J. H. Field, Jr., it is to go to J. Harris Field, Sr., or, if he be then dead, to his heirs. Eldon C. Field, the grantor, is, of course, not to be counted as a limitee, because he is a grantor, and the estate really remains his until his death. The only question is whether, under the statute, the ulterior limitee after the last of the two donees who

take in succession must be an *heir of the body* of such last donee,
or may some other be such limitee? Rev. Code 1880, § 1190;
Code 1892, § 2436. The solution depends on whether the
statute is to be regarded as prescribing the exact *terms* in which
the limitation it authorizes may be created, or whether it is to
be interpreted as fixing a period *measured by lives* beyond
which the ulterior limitation must not vest, and not designating
"heirs of the body" as the *only* authorized limitees to take after
the last of two donees. It seems plain that the statute forbids
fees tail by converting them into fee simple, and authorizes
the creation of estates to be enjoyed in succession by not exceed-
ing two persons, with remainder to the heirs of the body of the
last taker, and, if there are no such heirs, to go to the heirs of
the creator of the estate. No doubt the lawmakers had in mind
executory devises, and, having abolished fees tail, authorized
the creation of the estates described in the statute to which this
limitation must conform. Executory devises no doubt fur-
nished the idea of lives in being, but succession of donees had
no place in the law of executory devises. It seems plain that it
could not have been the purpose to interfere with *executory
devises,* but that, having effectually destroyed fees tail, it was
intended to authorize, as a substitute therefor, the succession of
interests authorized by the proviso, so as to enable one to give
an estate to his wife and children, or others, in succession, with
remainder to the heirs of the body of the last taker, and, if none,
to go to the heirs generally of the donor. If the effect of the
statute is to prescribe the *precise terms in* which an estate may
be limited to persons in succession, the ulterior limitee must be
"heirs of the body" of the last taker. In this view heirs not of
the body cannot take, because the statute says "heirs of the
body." The original act said "heir or heirs of the body," and
did not limit the number who might take in succession. Hutch.
Code, p. 609, sec. 24. In 1857 the change to the present pro-
vision was made. Code 1857, p. 307, ch. 36, art. 3. Execu-

tory devises were not required to be to a *succession* of donees.
They might be limited on any number of lives in being, none of
which had any interest in the estate limited on them, and so it
seems the statute evinces no purpose to affect executory devises,
but, having effectually prohibited fees tail, really designed to
permit the sort of devolution of property in land provided for
in the proviso.    Should the idea prevail that no future limita-
tion of land can be made except as prescribed by the very words
of the proviso, while *personalty is* subject to the former law of
executory devises?    In *Cannon* v. *Barry,* 59 Miss., 289, it was
announced that a statute was not intended to *prescribe a formula
to* be adhered to in future limitations.    The estate contem-
plated by the proviso is so widely different from executory
devises that they could not have been had in view in enacting it
except as furnishing the idea of lives in being.    The statute
prohibited fees tail, and authorized a statutory substitute for
them, and left executory devises wholly unaffected.    The stat-
ute, in its real meaning, says: "There shall be no fees tail—
*i. e.,* you shall not tie up land by limiting it to heirs of the body
generally or specially—but you *may give* it in succession to
persons then living, not exceeding two, and the heirs of the
body of the survivor of these two."    The original act was to
serve the purpose of family settlement, and there was no limita-
tion of the number of successive owners, thus enabling one to
limit in succession *all* his children or other persons.    The code
of 1857 cut the number of successive donees down to two, and
thus defeated to some extent the purpose of the original act.
*Cannon* v. *Barry,* 59 Miss., 289, was decided in 1881, and I do
not think it right to disturb the finding of the very able court in
that case in a matter so important to property rights.    Too
many legislatures have come and gone without interference
with the conclusions in that case.

    I am in accord with the opinion of the Chief Justice on the
law, and also in the concurring opinion, on the facts, by Judge
TRULY.

TRULY, J. (specially concurring).

Reviewing the facts of this case in the light of a completed record, taking into consideration the proof adduced before and after the remand of the case by this court, passing upon the acts of the parties in the light of their environment at the time, the conclusion that the compromise of the 21st of November, 1896, was fairly entered into, is valid, and should be upheld, is irresistible and inescapable. However it may have appeared in the dim, uncertain light of the incomplete record before the court upon the former hearing, a candid and impartial examination of the record now presented demonstrates that Bate Field acted with full knowledge of all her rights in the premises, and, in view of the many legal obstacles in her path, it cannot be said that she decided unwisely in accepting the compromise offered as the result of some days' negotiation. In passing on her actions at the time, it is not amiss to narrate briefly her surroundings and the past events which led up to and culminated in the execution of the compromise deed. The photograph of Miss Bate Field, as shown by the record, is this: A young lady twenty-one years of age, educated, cultured, traveled; so capable and intelligent that at nineteen her parents deemed her competent to transact her own business affairs, and upon their petition her disabilities of minority were by the chancery court removed. She had been familiar with the protracted litigation almost from the day of its inception. She was present at, and understood, repeated conversations between E. C. Field, her uncle; Sarah M. Field, her mother, and their lawyers. The answer filed to one of the bills of complaint is confessedly in her own handwriting, and in this answer the theory of the defense is set forth with wealth of detail, and the trust deed of August 30, 1890, specifically referred to, and her claim of title based on its provisions. She had been kept posted by letters of counsel, forwarded to her by her mother, of the various plans by which it was hoped victory could be snatched from the jaws

of defeat. She had been advised of the ebb and flow of their hopes of success, and knew that these had receded and left her ship of promise stranded. She had learned through the letters of that attorney, dated July 8, September 7 and 14, 1896, how desperate was the chance of success. Possessing this information, she, with her mother and brother, went to the conference which resulted in the compromise. The record shows further that the attorneys who represented her were vigilant and faithful in the discharge of their duty in guarding her interest. We find that they had diagnosed the case with great acumen and professional skill. On July 8, 1896 (four months before the compromise), in a letter to Mrs. Sarah M. Field, which was forwarded to Miss Bate Field, they had set out this diagnosis, pointed out the weaknesses of the case, and indicated the desperately slight chance of final recovery. Subsequently, on September 14th, we find one of the attorneys writing that his greatest fears had been realized; that "they have sworn us clear out of court," as the witness had testified "as we feared he would do;" whereupon, despairing of final success, but still faithful to their client, seeking to save something from the wreck, her attorneys broached the subject of a compromise to the attorneys of the Middlesex Banking Company, and, when this had culminated in the submission of a definite proposition, summoned their client to a conference. It is impossible, in my judgment, to read this record, and follow this case through all its manifold and devious changes, without being convinced that the attorneys who represented Bate Field not only acted with absolute fidelity to their client, but displayed rare skill in their efforts to save a case which appeared beyond the power of legal medicament. The letter of July 8, 1896, is incontrovertible evidence of the careful consideration which the writer had bestowed on the case. Its various phases are therein pointed out, the proposed plan of treatment indicated, and the legal complications which might arise clearly stated. It should be

noted also that this compromise was not of the seeking of the Middlesex Banking Company. The attorneys for Bate, realizing the doubtfulness, if not hopelessness, of their cause, made the first approach, which, after several counter propositions, resulted in the offer which was finally accepted.

Coming now to the occasion on which the compromise was formally closed and the deed in pursuance thereof executed, we find that Bate Field was fully posted as to all past details of the litigation, with full information of all material facts; that she had a long consultation with her attorneys, who, being themselves informed in the premises, went over in detail every theory of the case, and made disclosures of all the material facts bearing on the case. Again, it is disclosed that Bate Field was not pressed for an acceptance of the offered compromise. On the contrary, after mature reflection, she decided to accept the offer, and therefore, when the attorneys for Middlesex Banking Company endeavored to end the negotiations, and withdrew the offer of compromise on account of a doubt which arose as to her age, objection was made on her behalf by her counsel, and Mrs. Sarah M. Field, her mother, by affidavit supplied the proof that Bate Field had attained her majority, which proof enabled her to acceptably execute the compromise deed. After execution the deed was retained in her possession for several days before counsel for appellant finally concluded to accept the deed and pay the sum agreed on.

Here, then, is the scene, and these the actors in the drama, as they are portrayed by the completed record of the cause: A young lady, intelligent, competent, fully informed, advised by shrewd and faithful counsel devoted to her interest and learned in the law, with no concealment on the part of any one, granted ample time for reflection and examination, who, after full discussion, enters into a compromise, and by so doing obtains money, of which, at that very time, according to her own story, she stood in pressing need. She was not pressed for an accept-

ance of the offer made, but she, her mother, and her attorneys insisted on appellant carrying the compromise into effect.    To hold a settlement of a pending, doubtful litigation consummated under such circumstances invalid would be to overturn the firmly established principle of law which encourages compromises, and would set at defiance repeated adjudications of this and other courts.    We adhere to its fullest extent to the doctrine that a court of conscience will protect the ignorant or unwary from fraud, unconscionable imposition, or oppression. But this is not the case.    Capable of contracting, fully informed, advised of her rights and her prospects, counseled by attorneys of unblemished character and of unquestioned ability, after full and calm deliberation, Bate Field converts her chances of future success into ready cash.    Such a transaction is supported by every principle of law and justice and right.    The compromise by Bate Field being valid, appellee has no right of action.

As this is decisive of the case, I have not deemed it necessary and do not now pronounce any conclusion as to the validity or construction of the trust deed of August 30, 1890.

I concur specially in the result.