WILLIAM J. DAVENPORT ET AL. v. MAKEL M. COLLINS ET AL.

[48 South. 733.]

1. ESTATES IN FEE TAIL. *Statutory fee simples.*

Under the statutes of this state, since the act of June 13, 1822, estates created which at common law would have been estates in fee tail, are estates in fee simple. Poindexter's Code, p. 458, sec. 24; Hutchinson's Code, p. 609, sec. 24; Code 1857, p. 307, sec. 3; Code 1871, § 2286; Code 1880, § 1190; Code 1892, § 2436; Code 1906, § 2765.

2. WILLS. *Construction.* *"Heirs." "Heirs of their bodies."*

In a will, by which testator left his property to his wife and three children in equal proportions during their natural life, "and to the children and heirs of their bodies" at the time of their death, and providing that, if they have no children or heirs of their bodies, it shall revert to testator's estate and be again divided between his wife and children, "or such of them as shall survive, and to their heirs, share and share alike . . . and all the children of my deceased children," the words "heirs" and "heirs of their bodies" mean children.

From the chancery court of Jefferson county.

Hon. J. T. Drake, Special Chancellor.

Mrs. Collins and others, appellees, were complainants in the court below; Davenport and others, appellants, were defendants there. From a final decree granting complainants relief defendants appealed to the supreme court. The facts are stated in the opinion of the court.

*Mayes & Longstreet,* for appellants.

This litigation is over a plantation; and it arises between a testator's grandchildren who claim to be remaindermen under the terms of the will, on the one hand, and certain sub-vendees of his children themselves who claim that the effect of the will was to invest his children and widow with a fee simple title which they had a right to convey away, and did convey in fee.

The contention of the appellants in support of their title moves along three distinct lines, any one of which, if good, gives the title to them and requires a reversal of the chancellor's decree and a dismissal of this suit.

1. Appellants contend that the limitations of the title to the real estate which are contained in paragraph 3 of the will are not directed at, and do not control, the home place; but that this place, and the title to it, are controlled solely by the provisions of paragraph 5. In other words, that the home place, expressly dealt with, as it is in paragraph 5, beyond dispute, is one of the exceptions of real estate "otherwise disposed of in this will," made in so many words in paragraph 3 itself.

2. Even if the home place is to be taken as included within the estate dealt with by paragraph 3, then the provisions of paragraph 3 are such as that the rule in *Shelley's case* applied, and the heritable estate (in this case, by virtue of the statute, of fee simple instead of fee tail) vested in the first taker; and, therefore, the deed to Davenport passed a fee simple title. *Powell v. Brandon,* 24 Miss. 343; *Dibrell v. Carlisle,* 48 Miss. 691; *Pressgrove v. Comfort,* 58 Miss. 644; *Cannon v. Barry,* 59

Miss. 289; *Harris v. McCann,* 75 Miss. 805, 23 South. 631; Code 1880, § 1201; 25 Am. & Eng. Ency. Law, p. 640; *Hudson v. Gray,* 58 Miss. 882, 891, 892; *Willis v. Foltz,* 12 L. R. A. (N. S.) 283; *Strawbridge v. Strawbridge,* 4 L. R. A. (N. S.) 948; *Lofton v. Murchison,* 80 Ga. 391; *Banking Co. v. Field,* 84 Miss. 646, 657, 37 South. 139.

3. Again, even if it be considered that the home place falls within the real estate dealt with in paragraph 3, and even if it be considered that the rule in *Shelley's case* does not apply, yet still the statute of 1822 against perpetuities does not apply, and by virtue of that statute, the first donee took a fee, and the deed to Davenport invested him with a fee. *Lofton v. Murchison,* 80 Ga. 391; *Banking Co. v. Field,* 84 Miss. 646, 37 South. 139.

*W. C. Martin* and *Ratcliff & Truly,* for appellees.

It is conceived that the real issues in this case are two: First, What kind of estate in his children and their issue was created by clause 3 of the will of Washington S. Burch? Second, Was the property mentioned in clause 5 governed by the limitations in clause 3?

The third paragraph contains the general scheme of the testator in the disposition of the bulk of his property; the time and manner of making the several possible divisions contemplated by it are provided for in clause 6. It was manifestly the desire and intention of Mr. Burch to keep his estate in the hands of his wife and three children, Eliza, Isaac and Mary, and the descendants of these children, at least until the death of the wife and the three children. He provides for the division of the estate into four equal parts and gives to each of them one of the sharts so to be divided off and alotted, "to be theirs and each of theirs during their natural life, and to the children and heirs of their bodies, if any they have at the time of their death." Thus far the meaning is clear: His wife and children were each of them to have one allotted share for life, with remainder in fee to such issue as each should have living at the time of their re-

spective deaths. Contemplating, however, the possibility that one or more of the life tenants might die without lineal descendants, the testator, in the next paragraph, provided for such a contingency by limiting over the share of any one of them who might so die to his estate in gross, to be re-divided among the same devisees or such of them as might then be living, and to their heirs, share and share alike, they to take a life estate only, and all the children of "my deceased children (if any) to take only such share as their deceased parent would have taken." At first glance this might appear somewhat obscure but a little consideration clears it up. The testator is here dealing with a lapsed share and its new division among his wife and surviving child or children. The expression "they to take a life estate only," evidently applies to the survivors who could re-divide the lapsed share, the word "they" meaning the surviving life tenants, and the expression "and all the children of my deceased children (if any) to take only such share as their deceased parent would have taken" while awkwardly phrased, perhaps, must mean that after the termination of each life estate the children of each life tenant would take his or her share in fee simple. It can mean nothing else; it cannot refer to the children of any of the four original life tenants who had died, because the contingency here provided for could arise only in case of such death without issue; so that the only children who could be embraced in the paragraph under consideration would be the children of the survivors of the four life tenants. This construction effectuates the purpose of the testator and is in perfect harmony with the first paragraph of clause 3. He divided his estate into four equal parts, giving his wife one and each of his named children one; they were severally to take a life estate in the same. In the event that any one of them died leaving children or lineal descendants, the fee in that share was to vest in such children or descendants, and it was freed from the ulterior limitations of the will. Should any one die without children, or descendants, instantly the whole estate in that original share passed, by lim-

itation, over to the survivors, to be held by them, share and share alike, for life, with the fee in each share to go to their respective children. Should any of the new life tenants die without issue surviving, then, under the first paragraph, as the whole includes every part, that new share would again pass to the survivors, for life with the fee limited as before. As each life tenant died leaving children or descendants that portion of the estate held by the descendant under the will vested in fee in those children or descendants. In case all four died without leaving lineal descendants all the limitations over after termination of the life estate would fail for want of persons to take and the estate would vest in the heirs general of the testator. Should some of the four life tenants leave children but the last survivor die without any, that portion of the estate held by the surviving life tenant would go to the testator's heirs, who, in such case, would be the descendants of his children who had already died. Thus, in every contingency, the whole estate would go to the lineal descendants of the testator's children, if there were any living at the time of the death of the last survivor of the four original life tenants, and so the estate would be kept for life in those four, and after their death, would vest in fee simple in testator's grandchildren, or some remote posterity, as the case might be under the condition of the will. The only contingency possible that would defeat this result, or transmit the estate, or any part of it, to persons other than the testator's descendants, or heirs in general, was the remote possibility that Mrs. Burch would outlive all her three children, Isaac, Eliza Jane and Mary, that they would all die without issue, and that she herself would remarry and have issue by her second husband, who would, upon her death, take the estate. Of course, if Mrs. Burch should marry again and have other children and die before the decease of all her children by her marriage with Washington S. Burch, then under the limitation in clause 3 of the will the share allotted to her for life would pass in fee to all her surviving children, both those by the first and those by the

second marriage. Under any conceivable circumstances the fee in all of the lands was bound to vest in somebody at the time of the death of the last survivor of the four original life tenants, who were all in being when Mr. Burch died, and, therefore, the limitations are not in violation of the rule against perpetuities and are valid. This will was probated in 1843 and was subject to the law as it then existed on this question. Under the Act of 1822, sec. 24, with proviso, a testator could make a conveyance to succession of any number of donees living at the time of his death, with ulterior limitations. Hutchinson's Code, ch. 42, sec. 24.

So the conveyance to a succession of four donees, who were all in being at the time of Mr. Burch's death, did not create a perpetuity. The rule in *Shelley's case* has no application since the intention of the testator throughout the limitations of clause 3 was perfectly clear that the words "children," "heirs," and "heirs of the body," as used therein, all meant descendants living at the death of the several life tenants, and not an indefinite succession to the remotest posterity, and were words of purchase and not of limitation. *Carroll v. Renich,* 7 Smed. & M. 798; *Powell v. Brandon,* 2 Cushman, 343; *Hampton v. Rather,* 1 George, 193; *Curradine v. Carradine,* 4 George, 687; *Cannon v. Barry,* 59 Miss. 290.

The last case cited *supra* is especially applicable, as it establishes the rule that any limitations that may be made by a testator are good, provided only that the fee shall vest within twenty-one years and ten months after the death of the last devisee, life tenant. In the case at bar the fee in the entire property must vest within ten months after the death of the last surviving life tenant, and, consequently, the limitations of clause 3 of the will were valid, and the wife and children of Mr. Burch took life estates and not a fee.

The second question involved is whether the homestead referred to in clause 5 of the will is governed by clause 3. If not appellees must fail in this suit, as in that event, the children of

the testator took fees in the land and Davenport acquired a fee simple from them by his deed in 1856. Before considering this proposition it may be well to advert to the facts as to the dealings with this land. Mr. Burch died in 1893; in 1845 his widow, then remarried, conveyed, or attempted to convey, a life estate in it to the three children, Isaac, Eliza and Mary; in 1847 Mrs. Miller, by petition, sought the aid of the probate court in allotting to her her share in her father's estate, upon the ground that she was then married and entitled to such allottment, under clause 6 of the will. Commissioners were appointed and they set apart to Mrs. Miller the one thousand acre tract constituting the homestead; Mrs. Dangerfield assented to this proceeding, the report of the commissioners was confirmed and Mrs. Miller went into possession of the land and finally, in 1856, in conjunction with her brother and sister, Isaac and Mary (or Nancy), attempted to convey it in fee to Davenport. Now, if this land was subject to the limitations of clause 3 as well as the provisions of clause 5, when Mrs. Miller went into possession under the allottment of the commissioners after Mrs. Dangerfield had relinquished all her testamentary claims upon it, she held it as a life tenant only, with a vested remainder in fee in her children, subject to be defeated by the contingency of her death without issue, in which case the ulterior limitations would take effect: when she died in 1907 appellees, her children became tenants in common in fee under their grandfather's will, and must prevail in this suit.

Was clause 5 practically a part of clause 3? We contend for the affirmative of the proposition, for the following reasons:

First. The position of clause 5 in the will in case the land affected by it was intended to be governed by the general devising clause—clause 3. The court will notice that the first eight clauses are devoted to the details of the administration of his estate, the comfort of his wife, her maintenance and the education of his children, the preservation of the estate for a limited time, and the final disposition to be made of it. Be-

ginning with the ninth clause the testator turns his attention for
the first time to the matter of special devises; by clause nine he
makes a special devise to his son Isaac; by clause ten he makes
a special devise to his children of the land and personal property
of the plantation on which his mother resided. The court will
note that in this clause the significant words "as hereinbefore
provided, etc." to be found in clause are omitted. The wife too is
not mentioned in the clause, so that it might be fairly contended
that as to the land affected by clause 10 the children did take a
fee: by clause 11 the testator makes a special devise to John
D. Burch, etc., and in the final clause he names his executors.
We thus have three successive devises, forming exceptions to
the general devise in clause 3, and satisfying the parenthetical
sentence in that clause, placed where they should be at the end
of the will and strongly suggestive, by their position in the
will, arrangement and sequence, that these were the properties
in the mind of the testator when he used the words, "except
such as is particularly excepted and otherwise disposed of in this
will." Now, clause 5 immediately precedes the paragraph in
which the testator provides for the time and manner in which
his general estate shall be divided: the mind of the writer was
upon the question of the method to be adopted in making the di-
visions, and these divisions were to affect the property of which
he had previously spoken—all the property mentioned by him
in previous paragraphs. He had not yet come to special devises:
and he did not reach them until he had made complete provision
for the carrying out of his general will.

Second. The language employed in clause 5 indicates that the
testator was not creating any different estate in the homestead
than was employed for in clause 3. He does not therein use the
words "it is my will and desire," which begin all the other para-
graphs of the will (except the 6th). He expressed a wish that
his wife should remain upon the homestead but he does not give
her any life estate in the property; she is given a bare right to
remain in possession as long as she desired to do so—whereby

the testator, as it were, anticipated our statute permitting the widow to prevent partition of the homestead so long as she chooses to possess and use it. But the widow might at any time signify her assent to the division of the homestead as part of the general estate "among the heirs," in the language of the will. Who were the people meant by the word "heirs" in this connection? Clearly those who were the beneficiaries under the genral devising clause; the words mean all those who were left shares in the estate by that clause, being the three children and Mrs. Burch herself. The testator assumes here that a division would be made in case of Mrs. Burch's willingness to have one, but does not point out the persons who were to take under it, except by the incidental use of the word "heirs." Why? Because he had already in the general devising clause, provided for the persons who were to be the beneficiaries and created their estate, and he evidently considered that his intention was sufficiently clear to use of a word that, while not strictly appropriate, from its technical meaning, was general and will embrace all the objects of his bounty previously classified. While it is true that the word "as" "will be taken in its technical sense unless there is any will, a clear demonstration that the testator used it in a different sense" (*Irving v. Newlin,* 63 Miss. 196), yet the connection in which the word occurs here does clearly demonstrate that it was not used in its technical sense but that it referred to a class of persons who had already been indicated in the will, in other words to devisees. The testator, indeed, is not in this clause making any devise at all; he is merely pointing out the conditions under which a previous devise should become operative as to this land. *Harkleroad v. Bass,* 84 Miss. 483, 36 South. 537.

Again, the use of the words in clause 5, "when the same shall be divided as hereinbefore provided in regard to other property —equally among my children," seems conclusive that it was intended that the nature of the title to this land should be governed by clause 3. The reference to clause 3 and the use of the

little word "as" undoubtedly linked the two clauses together as governed by one and the same purpose. The land was to be divided how? As provided in clause 3; it was to be held after division by the very title created by clause 3. If the construction should be adopted that these words meant merely that the land was to be equally divided and then held in fee, and did not convey the idea that when divided it was to be held under the title of the life tenants, with remainders over, etc., violence would be done to the plain significance of the terms used, and the manifest general intention of the testator thwarted, that purpose being that the children should take only for life and that the ultimate fee should vest in grandchildren or more remote descendants. The concluding words of the clause, "equally among my children," are additional to and explanatory of those immediately preceding, but they add nothing to and subtract nothing from their force. The word "as" means "the same," "in all respects alike," and a construction that would make it mean *"something* like," "in some respects similiar," would be an emasculation of its true and full sense, and would, moreover, do violence to the elemental rule of construction that words are to be taken in their ordinary sense unless the context shows that they were used with some other sense. *Paxton v. Oliver,* 70 Miss. 570, 12 South. 799.

The objection that might be made to the construction contended for, that the words "equally among my children" take this land out of the scope of clause 3 because Mrs. Burch was one of the four life tenants contemplated in that clause, while only three are contemplated by clause 5, is of no force, because, as above pointed out, a division of the land into four parts might be made whenever Mrs. Burch assented to it, and, in case she did not assent and remained on the land until her death, then the land was to pass to the very persons to whom, under clause 3, it would have gone had it been allotted to Mrs. Burch as her share, *i. e.,* to the children of herself and testator. At her death, of course, no fourth share was needed to carry out the

purpose of the testator and this land would then pass under the limitations of clause 3. Mrs. Burch has no life estate given her by clause 5. She has the right to possess, with the veto power enabling her to postpone division of the land until her death, if she saw fit, and that was all. When she should die, then the division into shares with life estate tenures and limitations over already carefully provided for was to be made, she herself being eliminated by death.

Third. The codicil to the will clearly supports the views here advanced. In it we have a life estate given to the widow, with remainder over in fee simple to his children. How different is the language used from that heretofore under consideration! The testator here evinces a perfect knowledge of the legal effect of the words he is using, and, by employing them, calls attention to the fact that, as to this particular tract, he is giving his widow a life estate with fee to his children, instead of cross-remainder does. No such words were employed in the will proper, because, in it, he was not giving his children a fee simple, as he was doing in the codicil, and he made use of different terms to convey a different estate. This clear perception on the part of the testator of the value and meaning of legal terms whether of his general knowledge or gained by consultation with a lawyer is very persuasive that our position is the sound one. The codicil also makes more manifest what, indeed, was plain enough before, that Mrs. Burch was never intended by her husband to take a life estate simply by force of the fifth clause. Mr. Burch knew how to create a life estate by apt words and he did it in clause 3 of his will and in the codicil but never in clause 5. The actions of the parties and the court, in what might be called a cotemporaneous construction of the Burch will support the claim of appellees. The record shows that Mrs. Dangerfield assented to the division of this land under the order of the probate court; that Mrs. Miller filed her petition to have her share in her father's estate allotted to

her under his will; that commissioners were appointed and set off this land to her as her share in the general estate, brought in as the land was by the consent of the widow; that this occurred in 1847; nine years later, in 1856, Mrs. Miller, in derogation of the rights of her children, sold the land to Davenport by a deed in fee. The other children of Washington S. Burch joined her in this conveyance, but their previous conduct in permitting this land to be allotted to Mrs. Miller by order of the probate court shows clearly enough that they knew that they were attempting to convey title that they did not possess; for if they had believed that Mrs. Dangerfield's quitclaim to them in 1845, coupled with clause 5 of their father's will really vested them a fee simple as cotenants with Mrs. Miller then they would never have permitted the whole land to be given to Mrs. Miller by the probate court in the division of the Burch estate, for the same reason that as to this particular land they would have thought they had a fee, but as to the balance of the estate not specifically devised, they would have only had life estates, and they would not have permitted Mrs. Miller to get the whole of that part of the estate in which they all had equal shares in fee. Again, if they had really taken a fee and Mrs. Miller in the partition had been given this land, then there would have been no necessity for their joining her in the deed to Davenport, as she would have the entire estate in herself. In 1847 all parties, and the court, dealt with the land as part of the general estate of Mr. Burch. The truth is, doubtless, that in 1856, the Burches thought they would chance it on the ambiguity on clause 5, and that the purchaser Davenport would chance it too, so he was willing to take a doubtful title. As a matter of fact he did not make such a bad bargain after all, as he and his vendees have enjoyed the possession of the land since 1856, a period of over fifty years. Mr. Davenport, however, and all those claiming under him were bound and held to notice of what sort of title he got by reason of the probate and record of Mr. Burch's will and could take only such title as

passed thereunder. *Millsaps v. Shotwell,* 76 Miss. 923, 25 South. 359.

Upon the whole case we confidently urge—

First. That the homestead was subject to the title limitations of the general devising clause of the will.

Second. That under that clause the children of Mr. Burch took life estates in equal shares, with remainders to their children or descendants living at their death, subject to be defeated by the contingency of the death of life tenants without issue surviving, with cross-remainders conditioned upon such contingency. That there were valid limitations under the law as it then stood.

Third. That when Mrs. Miller received and took possession of the one thousand acre tract constituting the homestead, under allotment by the commissioner, she took a life estate only in it, with remainder to her children living at her death, defeasible in case she left none that, at her death in 1907, a fee simple title vested in appellees as her living children, and the ulterior limitation was defeated; and that appellees were entitled to recover. This was the opinion of the court below, and should be affirmed we think.

Argued orally by *Edward Mayes,* for appellants, and by *W. C. Martin,* for appellees.

FLETCHER, J., delivered the opinion of the court.

One Washington S. Burch, a citizen of Jefferson county and a gentleman of large means, made a will in 1843, undertaking to dispose of a large amount of landed property. This controversy involves the proper construction of the third and fifth clauses of the will.

The third clause is as follows: "It is my will and desire that all of my estate, both real and personal (except such as is particularly excepted, and otherwise disposed of in this will), be equally divided between my beloved wife, Adaline Burch, and

my three children, to wit, Isaac W. Burch, Eliza Jane Burch, and Mary Burch, share and share alike, and I do give and bequeath to them the same in equal proportions as aforesaid, to be theirs and each of theirs during their natural life, and to the children and heirs of their bodies, if any they have at the time of their death; if not, the same shall revert to my estate in gross and be again divided between my said wife and children, or such of them as shall survive, and to their heirs, share and share alike, they to take a life estate in the same only; and all the children of my deceased children (if any) to take only such share as their deceased parent would have taken; but, should any of my said children die without issue before such division, such division to be made among the survivors of my said children and my said wife."

The fifth clause is as follows: "It is my wish that my wife remain in possession of the plantation on which I now live, and that she have the use of the household and kitchen furniture and stock, for and during her natural life, and that neither shall be divided among the heirs without her express assent until after her death, when the same shall be divided as hereinbefore provided in regard to other property, equally among my children."

By another provision of the will the wife was given the right to withdraw her share of the estate at any time she might desire. Mr. Burch, at the time of the execution of the will, had only the three children, mentioned in clause 3 of the will, and all of these children in 1843 were unmarried infants. By the sixth clause of the will any one of the children, upon attaining his majority, could have his share set aside to him.

The property in controversy is the home mentioned in the fifth clause. After the death of Mr. Burch, the widow remarried and withdrew her share, and at a later time, by appropriate proceedings, the home place was set aside to Eliza Jane Miller (*neé* Burch). Mrs. Miller died in 1907, and her children, contending that their mother had only a life estate, with remainder to themselves, brought this suit against the per-

sons now in possession, who are the successors in title to the vendees of the children of Washington S. Burch, who in 1856 had all joined in a deed to one Davenport, purporting to convey the fee-simple title. From a decree in favor of complainants, this appeal is prosecuted.

It will thus be seen that the question here for decision is whether the children of Burch, under the will, took the fee-simple title, or whether they took as life tenants, with remainder to their children. If the first be the correct view, that title has by the deed of 1856 passed to appellants, and they must prevail. If the second view be correct, then the grantees in the deed of 1856 took only the interest of Mrs. Miller, which was an estate terminable at her death, and appellees must win. It is here earnestly insisted on behalf of appellants that the fifth clause of the will is independent of the third clause, and that by the provisions of the fifth clause, standing by itself, the home place is to be divided among the children, without regard to the limitation for which the third clause provides. But we are unable to resist the conclusion that the phrase "as hereinbefore provided" refers this property back to the controlling provisions of the third clause, subject to all its restrictions and limitations. We do not elaborate this view, since, as we think, appellants must prevail upon another and distinct view.

We come to consider the meaning of the third clause. It is, of course, perfectly obvious that the testator by this clause created life estates in his wife and children, with remainder to their children; and, if this were the only provision, of course, appellees would now be entitled to the property, the life tenancy having terminated. But the will further provides that, in case any of the children shall die without "children and heirs of their bodies," then the share of such deceased child shall revert to the estate in gross, to be again divided "between my said wife and children, or such of them as shall survive, and to their heirs, share and share alike, they to take a life estate in the same only; and all the children of my deceased children, if any,

to take only such share as their deceased parent would have taken." It will thus be seen that, if the language of the will is to be construed according to its ordinary grammatical meaning, any property subject to a second division would be divided, not only among the survivors of that class designated as "wife and children," but also among the children of any deceased child, such grandchildren of the testator to take as life tenants, with remainder to the bodily heirs of such grandchildren, if any there be. Looking only to the language of this clause, we can see no reason why the word "they," in the phrase "they to take a life estate in the same only," does not refer to the heirs of the "survivors," as well as to the survivors themselves.

But it is said, and correctly said, that the will must be taken by the four corners, and rigidly examined as to all its provisions, in order that the intent of the testator may be thereby discovered, and, if such general intent appear, then the particular language of the third clause will be wrested from its plain, ordinary, and grammatical meaning, in order that the intent of the testator may prevail. We recognize the soundness of this rule of construction, and have searched this will in its every line and expression for evidence of any intent to have the creation of life estates stop with the wife and children. There is no such expressed or implied intention, as we view it. Indeed, there are, here and there, scattered throughout the will, indications that the testator meant to do precisely what the language of the third clause obviously imports. Thus the eighth clause, dealing primarily, it is true, with personal estate, is a clear effort to restrain alienation. So that we are without evidence of any intention on the testator's part at variance with the language of the third clause, taken in its usual sense. It may be said that it is a canon of construction that the will should, if possible, be so construed as to give effect to each of its provisions. This is true, but none the less is it the duty of the court to defeat a provision of the instrument which is forbidden by law, especially when it fairly appears that the testator intended to

incorporate that precise feature in his will. We are clearly of the opinion that the intention of the testator, as gathered from the language of the will, was to provide for a contingency upon the happening of which life estates would be created in the testator's grandchildren, who were not in being at the time of the execution of the will. We remark here that it is evident that the words "heirs" and "bodily heirs," as here employed, are used in the sense of children. *Banking Co. v. Field,* 84 Miss. 646, 37 South. 139.

This conclusion being thus reached as to the meaning of the testator's language, *the case is ended;* for it was the law in 1843 that: "Every estate in lands or slaves, which now is or shall hereafter be created an estate in fee tail, shall be an estate in fee simple; and the same shall be discharged of the conditions annexed thereto by the common law, restraining alienations before the donee shall have issue, so that the donee, or person in whom the conditional fee is vested or shall vest, shall have the same power over said estates, as if they were pure and absolute fees: Provided, that any person may make a conveyance or devise of lands to a succession of donees then living, and the heir or heirs of the body of the remainderman, and in default thereof to the right heirs of the donor in fee simple." Hutch. Code, c. 42, art. 1, p. 609, § 24. It will readily be seen that the will under consideration, as above construed, violates this statute, since it provides for the creation of life tenancies in donees not living when the will was executed. Indeed, it is not disputed that the will, if construed according to our view, violates the statute against perpetuities, and that the attempt to create life estates was futile. Since the children were invested with the fee-simple title, that title passed to appellees and their predecessors in title by the conveyance of 1856, and appellants have no claim to the property.

*Reversed, and bill dismissed.*